United States District Court
District Of Maine

| | | |
|---|---|---|
| Maria Ikossi, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| St. Mary's Regional Medical | ) | |
| Center, | ) | Docket No. |
| | ) | |
| St. Mary's Health System, | ) | |
| | ) | |
| Covenant Health, Inc., and | ) | |
| | ) | |
| Christopher Bowe, M.D., | ) | |
| | ) | |
| Defendants. | ) | |

### Complaint of Employment Discrimination;
### Injunctive Relief Sought;
### And Demand For Jury Trial

Maria Ikossi brings this action against St. Mary's Regional Medical Center ("St. Mary's"), St. Mary's Health System, Covenant Health, Inc., and Dr. Christopher Bowe, and states as follows:

### Summary of Civil Rights Case for Employment Discrimination

1.    For over 20 years, Dr. Maria Ikossi has been recognized as one of the most skilled surgeons at St. Mary's. For example, in 2018 another physician at St. Mary's reported about her, "I have 100% confidence in her

clinical skills, she is probably one of the best in the hospital—she picks up issues that I and others miss—if she weren't here, it would be a huge loss to the hospital." And a medical assistant described her as "very patient-driven" and stated that "no one would do more for her patients than she will."

2.    Dr. Ikossi is age 76 and speaks with an accent because she grew up in Cyprus and came to the U.S. at the age of 17. In 2018, she was discriminated against and forced to undergo an unwarranted and degrading fitness-for-duty exam in an effort to manufacture an excuse to fire her. The pretexts for the fitness-for-duty exam were a minor eye condition she had for 40 years and her "conduct" including allegations of unprofessional conduct dating back to 2000 that had been thoroughly investigated and rejected as discriminatory.

3.    On August 20, 2018, the doctor retained by St. Mary's to examine Dr. Ikossi's fitness issued a detailed report concluding that "both physician colleagues and staff who know Dr. Ikossi's work well are consistent in their report of her high level of medical competence and dedication to patients and to patient care." The independent report further concluded that Dr. Ikossi's behavior did not raise a "concern for her ability to safely practice medicine" but rather, that she "clearly has staff and physicians with whom she can work well."

4.    The special committee asked to investigate Dr. Ikossi made a

2

unanimous finding that there was no evidence that "her actions adversely affected the delivery or quality of patient care or was disruptive to Medical Center operations."

5. Even though all the investigation findings were fully in favor of Dr. Ikossi, St. Mary's went ahead with its preordained plan and imposed discipline on her anyway, forcing her to take a course for correcting "disruptive behavior." The investigation and its baseless discipline permanently sullied Dr. Ikossi's professional record and reputation.

6. On May 19, 2021, the Maine Human Rights Commission issued its findings that there are reasonable grounds to believe that Defendants engaged in unlawful discrimination against Dr. Ikossi on the basis of age, sex, race, national origin, ancestry, and disability and in retaliation for her engaging in protected activity opposing unlawful discrimination. On October 22, 2021, the Equal Employment Opportunity Commission similarly found reasonable cause to believe that Defendants had discriminated against Dr. Ikossi.

## The Parties

7. Plaintiff Maria Ikossi is a resident of Poland, Maine.

8. Defendant St. Mary's Regional Medical Center is a nonprofit corporation organized under the laws of the State of Maine. Its principal

place of business is a 233-bed acute care facility in the City of Lewiston in Androscoggin County, Maine.

9.   Defendant St. Mary's Health System is a nonprofit corporation organized under the laws of the state of Maine and located in Androscoggin County, Lewiston, Maine. It is the parent corporation of St. Mary's Regional Medical Center. And it is a member of Covenant Health, Inc., in Massachusetts.

10.   Defendant Covenant Health, Inc. (Covenant) is a nonprofit corporation organized under the laws of the Commonwealth of Massachusetts. It is engaged in sustained and consistent business in the State of Maine, including in the County of Androscoggin.

11.   From about January 2016 until about March 2020, Defendant Christopher Bowe, M.D. was employed by St. Mary's as the Chief Medical Officer (CMO), and he was the Chair of St. Mary's Medical Executive Committee (MEC). He is being sued individually solely for race discrimination under 42 U.S.C § 1981.

## Jury Trial Demand

12.   Plaintiff demands trial by jury on all issues triable by a jury.

## Jurisdiction and Venue

13.     This action arises under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634 (ADEA); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-200e-17 (Title VII); 42 U.S.C. § 1981; the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 (ADA); and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Rehab Act). This Court has proper subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights), and supplemental jurisdiction over Plaintiff's state law Maine Equal Pay Act claims under 28 U.S.C. § 1367(a).

14.     Venue is proper in the District of Maine under 28 U.S.C. § 1391(b)(1)(2) because (1) Defendants reside in Maine; and (2) a substantial part of the events or omissions giving rise to the claim occurred in Maine. Under Rule 3(b) of the Rules of this Court, this action is properly filed in Portland because Androscoggin County is "the county in which a substantial part of the events or omissions giving rise to the claim occurred."

## Facts

15.     Dr. Ikossi was born in Cyprus, an island country in the Eastern Mediterranean, in 1945.

16.     Dr. Ikossi's ancestry and race is Cypriot, and she is clearly identifiable as from another country by her accent.

17.     At the age of 17, Dr. Ikossi moved to the United States and has been living here ever since; she speaks English well and with an accent.

18.     In 1970, Dr. Ikossi graduated from medical school and since 1976 has been an attending surgeon.

19.     Dr. Ikossi's entire medical education and training has been in the United States, including medical school, residencies and surgical fellowships, and Ph.D. in experimental pathology.

20.     Dr. Ikossi has a limited double vision impairment known as "convergence insufficiency," dating back to a detached retina occurring in a car accident over 40 years ago.

21.     Since 1999, Dr. Ikossi has been an attending surgeon practicing general, thoracic, and oncologic surgery at St. Mary's Regional Medical Center in Lewiston, Maine.

22.     In 2007, Dr. Ikossi became an employee of St. Mary's Regional Medical Center.

23.     At St. Mary's, Dr. Ikossi has been widely recognized for her excellence of clinical skills and surgical services, willingness to be of assistance to colleagues, and her availability at all times, whether or not officially on call.

6

24.     Dr. Ikossi's record contains references in 2018 and earlier to Dr. Ikossi as the best general surgeon at St. Mary's.

25.     At St. Mary's, Dr. Ikossi has been widely recognized for her high quality of clinical knowledge and high standards for patient care. For example, Dr. Ikossi's record contains highly favorable descriptions of her in 2018 by other physicians at St. Mary's including, "I have 100% confidence in her clinical skills, she is probably one of the best in the hospital—she picks up issues that I and others miss—if she weren't here, it would be a huge loss to the hospital." Other employees at St. Mary's also spoke highly of Dr. Ikossi, including a medical assistant who described Dr. Ikossi as "very patient-driven" and stated that "no one would do more for her patients than she will."

26.     During 2018, and before, Dr. Ikossi repeatedly reported discrimination directed at her by St. Mary's because of her age and gender and foreign ancestry.

27.     During a rollout of a new electronic health records system called Epic in May and June 2018, Dr. Ikossi's Epic account was not properly configured for about six weeks, which caused extreme difficulties in safely caring for her patients and caused unsafe conditions for her patients. For example, she encountered difficulty in writing basic orders for fluids,

7

antibiotics, analgesics, and lab tests, because of a lack of the proper security clearance in Epic.

28.     Dr. Ikossi repeatedly reported that her Epic account was malfunctioning, but the problems were instead wrongly blamed on her.[1]

29.     On June 5, 2018, St. Mary's Director of Diagnostic Services – Imaging, Lab & Cardiology, wrongfully blamed Dr. Ikossi for a delay in patient care.

30.     On June 6, 2018, Dr. Ikossi received written notice from the CMO, Dr. Bowe, that, "based on [her] conduct" and her "self-reported double vision," the MEC had decided to require her to submit to a medical exam by a psychologist solely of its choosing, Dr. Christine Gray, for "an evaluation of your fitness to practice medicine."

31.     Dr. Ikossi was also notified that the MEC had decided to initiate a formal review of her practice, and in particular to review concerns about her personal conduct, and that this formal review would include an investigation of Dr. Ikossi by an ad hoc committee of three Medical Staff members.

---

[1] For much of 2019, Dr. Ikossi was regularly unable to log in to Epic. St. Mary's continued to wrongly blame her for these problems. Ultimately, St. Mary's had someone look into the problems and they determined the problem was not Dr. Ikossi and they fixed the problem.

32.     As a basis for the formal review by the MEC, Dr. Bowe misrepresented the issue of Dr. Ikossi's double vision and cited her need for support fixing problems with Epic.

33.     Dr. Bowe did not conduct any investigation before ordering the formal review by the MEC.

34.     The members of the MEC who took these adverse actions against Dr. Ikossi included Dr. Bowe and Dr. Doug Waite, the Chief Medical Officer of Covenant.

35.     When Dr. Bowe submitted his request for the formal review to the MEC on June 4, 2018, he included support documents purporting to represent complaints against Dr. Ikossi, but these did not provide a reasonable basis to initiate a review.

36.     Many of the documents that Dr. Bowe included were from the year 2000 or earlier. Those incidents had already been closely examined by a Hearing Committee in 2000, and the Committee had recommended that those incidents "should be regarded as 'dead', and that all records of them be removed from Dr. Ikossi's files at the Hospital."

37.     The Hearing Committee in 2000 investigated the incidents and found that no suspension and no punishment was warranted, that "a significant number of other physicians at St. Mary's express anger with staff and other physicians inappropriately," and that Dr. Ikossi "was singled out"

9

for a harsh application of a non-existent code on workplace contact and communication "where others have not been." In response to the findings of the Hearing Committee, the MEC decided to withdraw any adverse action against Dr. Ikossi.

38.    Dr. Bowe's request for a formal review also included an earlier MEC decision to suspend Dr. Ikossi that was overturned by the Hearing Committee in 2000, but he specifically excluded the extensive report of the Hearing Committee and the ultimate decision of the MEC to withdraw its suspension recommendation. This is direct evidence of Dr. Bowe's bad faith in initiating the formal review against Dr. Ikossi based in part on her conduct that was investigated in 2000.

39.    A letter from Matthew Nadeau was also included with Dr. Bowe's formal review request. Mr. Nadeau's letter contained several falsities that the MEC could have uncovered had it conducted any investigation before ordering Dr. Ikossi to undergo a competency review.

40.    For example, Mr. Nadeau twice stated that Dr. Ikossi had yelled at a St. Mary's nurse, "AS," which each time "brought [AS] to tears." During her evaluation of Dr. Ikossi, the MEC's appointed psychologist, Dr. Gray, investigated this claim, and AS reported that "she recognized at the time that Dr. Ikossi was not directing her frustration at [AS], but was reacting to a frustrating situation, commenting that '(Dr. Ikossi) was in another room—it

10

wasn't at me or about me.'" AS specifically stated that she did not file a complaint and "wouldn't have reported [Dr. Ikossi] for this."

41.     In violation of St. Mary's Bylaws, St. Mary's and Dr. Bowe did not produce to Dr. Ikossi, or even show or discuss with her, the letter from Matthew Nadeau until July 26, 2018.

42.     Aside from Mr. Nadeau's unsupported letter, Dr. Bowe relied primarily on materials that were at least ten years old to justify his request for the formal review. And Dr. Bowe relied on a coworker's complaint that was never communicated to Dr. Ikossi. Under St. Mary's Bylaws, that complaint should have been removed from Dr. Ikossi's file, because her supervisor was required to discuss the statement with Dr. Ikossi if he believed further action on it was warranted, and he did not do so.

43.     On July 9, 2018, Dr. Bowe provided false information to the MEC about the earlier formal review by the MEC in 1999 to 2000. Dr. Bowe falsely stated that Dr. Ikossi "outlasted the committee, she simply said no & the Med. Exec quit on the process after they could not agree."

44.     As noted above, in 2000 Dr. Ikossi appealed the proposed adverse recommendation (two-month suspension of medical staff membership and clinical privileges) of the MEC and in the words of the MEC, "the Ad Hoc Committee over the course of eleven days of hearings in a zealously litigated environment, heard the testimony of numerous witnesses and reviewed many

11

documents." After the Hearing Committee found in Dr. Ikossi's favor, the MEC withdrew any adverse action against Dr. Ikossi.

45.    Dr. Bowe provided Dr. Ikossi written notice on July 9, 2018, that her Medical Staff and clinical privileges at St. Mary's were suspended because of her failure to submit to the fitness-for-duty exam it had ordered with psychologist Dr. Gray. This unjustified suspension seriously disrupted care for Dr. Ikossi's patients, several of which had urgent care needs.

46.    Dr. Bowe falsely told Dr. Ikossi that she did not have the right to appeal that suspension. St. Mary's Bylaws state that Dr. Ikossi was in fact entitled to an appeal and hearing after the MEC took an "adverse action" including a "[r]eduction in or limitation of clinical privileges." The suspension of Dr. Ikossi's clinical privileges on July 9, 2018, clearly falls within that definition of an adverse action entitling her to an appeal and hearing.

47.    The Bylaws further provide, as part of the appeal and hearing process, that Dr. Ikossi had the right to a copy of all complaints and evidence against her before the hearing.

48.    Dr. Bowe and the MEC denied Dr. Ikossi the right to a hearing and a copy of all complaints against her. They instead only agreed to a meeting, held on July 16, for Dr. Ikossi to explain why her privileges should not have been suspended because there was not good cause to require her to submit to a fitness-for-duty exam with a psychologist.

12

49.     At the July 16 meeting, Dr. Bowe and the MEC did not provide Dr. Ikossi with any of the complaints Dr. Bowe had given the MEC to support his request that she be required to undergo the fitness-for-duty exam.

50.     The letter Dr. Bowe provided to Dr. Ikossi on June 6 to notify her of the MEC review did not explain why it had alleged concerns that she was endangering patient care, so she did not have sufficient notice of the charges against her to be able to defend herself. Because Dr. Ikossi had not seen the complaints against her, she could not address them at the July 16 meeting.

51.     On August 20, 2018, Dr. Gray provided her written report to Dr. Bowe, concluding that "both physician colleagues and staff who know her work well are consistent in their report of her high level of medical competence and dedication to patients and to patient care."

52.     Dr. Gray further concluded, in her professional opinion, that Dr. Ikossi's behavior did not raise a "concern for her ability to safely practice medicine," but rather that she "clearly has staff and physicians with whom she can work well."

53.     On August 20, 2018, Dr. Bowe and the MEC received Dr. Gray's detailed written report finding Dr. Ikossi fit to practice medicine safely.

54.     On August 27, 2018, Dr. Bowe and the MEC received the written report of their own Ad Hoc Committee they asked to investigate the concerns about Dr. Ikossi's fitness to safely practice medicine. That report made the

13

following unanimous finding: "We did **not** find any documentation where her actions adversely affected the delivery or quality of patient care or was disruptive to Medical Center operations." (emphasis added).

55.     Dr. Bowe and the MEC delayed three months to follow up with Dr. Ikossi on the pending formal review that had been hanging over her since June 6, 2018. On November 28, 2018, the MEC issued a report with the formal conclusion that Dr. Ikossi's behavior "has been disruptive to the operations of [St. Mary's] and that they [sic] materially impede the orderly and efficient administration of [St. Mary's] affairs."

56.     The adverse and highly defamatory finding from the MEC was directly contrary to both the August 27, 2018 report of the MEC's own ad hoc Committee and the August 20, 2018 report of the expert psychologist the MEC retained, Dr. Gray.

57.     Based on this false and defamatory finding, the MEC mandated that within nine months Dr. Ikossi complete an approved program "designed to assist physicians in improving communications, stress management, impulse control, and judgment when confronted with frustrating or difficult situations."

58.     The MEC's intention in ordering Dr. Ikossi to submit to a degrading psychological evaluation of her fitness and to undergo a program

14

for disruptive physicians was to goad her into refusing its unreasonable and insulting orders so they could use that refusal as a reason to terminate her.

59.    As further proof of the sham and pretextual nature of its proceedings against Dr. Ikossi, the MEC reached a finding against her that was completely contrary to the findings of both the psychologist it assigned to evaluate her and the Ad Hoc Committee it assigned to investigate its allegations against her.

60.    Dr. Ikossi is 76 years old and older than most, if not all, other surgeons at St. Mary's. Dr. Ikossi was singled out, when compared to the other, significantly younger surgeons, for degrading adverse actions despite her overall unusually good job performance.

61.    Social science and historical evidence demonstrate that employers often rely on negative stereotypes about older employees, including the stereotype that they cannot adapt to new technology. This prevalent, stereotype-based age discrimination is consistent with the mistreatment that Dr. Ikossi faced, including being wrongly blamed for problems with the new electronic health records system and being held to much stricter standards than younger surgeons regarding her use of that new system.

62.     Dr. Ikossi was also discriminated against based on sex because she was singled out, when compared to male surgeons, for unusual adverse actions despite her overall unusually good job performance.

63.     Social science and historical evidence demonstrate that female surgeons are often subject to double standards and adverse work conditions based on stereotypes about how women should behave, namely that they should be deferential and submissive. This prevalent, stereotype-based sex discrimination is consistent with the mistreatment Dr. Ikossi faced, including being held to a much stricter standard than male surgeons for her assertive behavior in the workplace.

64.     Dr. Ikossi was discriminated against based on race, ancestry, and national origin because she was singled out, when compared to surgeons who do not have an accent or other indications of being from a foreign country, for unusual adverse actions despite her overall unusually good job performance.

65.     Social science and historical evidence demonstrate that employees perceived as "foreigners" are often subject to double standards and adverse work conditions based on negative attitudes and stereotypes about foreigners. This prevalent, stereotype-based race discrimination is consistent with the mistreatment Dr. Ikossi faced, including being held to much stricter standards than non-foreigner surgeons for her assertive behavior in the workplace.

16

66.     The suspension of Dr. Ikossi's staff privileges, the MEC's demand that she undergo an examination to prove her basic fitness to practice medicine, and the course she was forced to take—which was insultingly labeled for "disruptive behavior"—have irreparably damaged her professional reputation and permanently undermined her ability to practice in her profession, especially because her age already makes her vulnerable to adverse stereotypes.

67.     Those highly stigmatizing adverse actions have made it extremely difficult, if not impossible, for her to secure employment or privileges at other hospitals.

68.     For example, Dr. Ikossi was forced to withdraw an employment application to a hospital that had offered her a contract because the hiring process would have required her to disclose that she had recently been required to undergo a competence review. And Dr. Ikossi had to delay her application for privileges to practice at another nearby hospital, and when she did eventually apply, she did not receive a response.

69.     St. Mary's administration also discriminated and retaliated against Dr. Ikossi by taking steps to hinder her medical practice and hurt her income by disseminating rumors that she is retiring and by attempting to divert patients away from her.

70.     In October 2019, Dr. Ikossi was subjected to additional retaliation and discrimination when she was singled out as the only general surgeon out of three (the other two surgeons were male) to be assigned to cover the consultations and surgeries of the breast clinic for a surgeon who left St. Mary's.

71.     St. Mary's did not ask Dr. Ikossi about the additional workload before informing patients that she would be taking over for the departing surgeon effective November 1, 2019.

72.     St. Mary's also required Dr. Ikossi to do this additional work for months with no compensation, even though she requested compensation repeatedly, including twice before November 11, 2019, and in writing on November 11, 2019, and on January 9, 2020.

73.     On February 23, 2020, and only after repeated requests, Dr. Ikossi finally received her first offer of compensation for this work.

74.     Upon information and belief, the offer was at a lower rate than what Dr. Ikossi's male colleagues and younger colleagues were receiving.

75.     The other two general surgeons are male. St. Mary's would not have assigned them this major additional work with no advanced notification and no additional compensation.

76.     This adverse and hostile treatment is further discrimination based on Dr. Ikossi's protected traits, including her sex.

18

77.     On May 19, 2021, the Maine Human Rights Commission issued its findings that there are reasonable grounds to believe that unlawful discrimination has occurred against Dr. Ikossi. On October 22, 2021, the Equal Employment Opportunity Commission similarly found reasonable cause to believe that Defendants had discriminated against Dr. Ikossi.

## Exhaustion of Administrative Procedures

78.     On April 2, 2019, Dr. Ikossi filed a complaint of race, age, sex, disability, ancestry, and national origin discrimination against the Defendants with the Maine Human Rights Commission (MHRC) and the Equal Employment Opportunity Commission (EEOC). The complaint was amended on May 15, 2020, to include additional acts of retaliation and discrimination by the Defendants.

79.     The EEOC issued a Notice of Right to Sue on October 29, 2021, which Dr. Ikossi received on November 1, 2021.

80.     Dr. Ikossi has exhausted all administrative remedies for all claims in this action that require administrative exhaustion.

## Legal Claims

### Count I

### (Federal Claims)

81.     The allegations above are realleged.

82.    All three corporate Defendants have intentionally discriminated against Dr. Ikossi because of her race, disability, sex, age, national origin, ancestry, and in retaliation for her engaging in protected activity opposing unlawful discrimination, in violation of the ADEA, Title VII, 42 U.S.C. § 1981, the ADA, and the Rehab Act.

83.    Covenant is liable as a joint or single employer because of its direct involvement in and control over the employees of St. Mary's generally and over Dr. Ikossi specifically through the direct involvement of its Chief Medical Officer, Dr. Doug Waite.

84.    Defendant Bowe has intentionally discriminated against Dr. Ikossi because of her race in violation of 42 U.S.C. § 1981. He acted with malice or with reckless indifference to Dr. Ikossi's federally protected rights under 42 U.S.C. § 1981.

85.    Dr. Ikossi is pursuing all possible methods of proving this discrimination, including but not limited to, circumstantial and direct evidence, pretext evidence, as well as causation based on a single unlawful motive and mixed motives, including an unlawful motive.

86.    As a direct and proximate result of Defendants' intentional discrimination, Dr. Ikossi has suffered and will continue to suffer damages, including, but not limited to, back pay and benefits, loss of self-confidence and self-respect, humiliation and embarrassment, emotional pain and

distress, suffering, inconvenience, mental anguish, loss of enjoyment of her job and of her life, injury to reputation, injury to dignity and personal wellbeing, and other pecuniary and non-pecuniary losses.

87.     Dr. Ikossi requests relief against Defendants as follows:

a.  Declare that the corporate Defendants violated Dr. Ikossi's statutory civil rights to be free from discrimination in employment because of her age, sex, race, national origin, ancestry, and disability discrimination and from retaliation for engaging in protected activity opposing unlawful discrimination; and further declare that Defendant Bowe violated Dr. Ikossi's rights under 42 U.S.C. § 1981 to be free from race discrimination and from retaliation for engaging in protected activity opposing unlawful race discrimination;

b.  Enter injunctive relief ordering the corporate Defendants to:

i.   Provide effective civil rights training for all Human Resource employees and all supervisors on the requirements of all applicable laws prohibiting employment discrimination because of age, sex, race, ancestry, and national origin and retaliation, and complete this training within 60 days of the entry of Judgment for Injunctive Relief;

ii.  Provide this training for two years after the date judgment

is entered to all new Human Resources and supervisory employees within 60 days of their starting the position;

iii.     Maintain attendance sheets identifying each person who attended each training session and forward a copy of the attendance sheets to Plaintiff's counsel within seven days of each training session;

iv.     Post at each of its worksites a copy of a remedial notice detailing the judgment in this case as well as the order providing injunctive relief; and

v.     Send a letter printed on Defendant St. Mary's Regional Medical Center's letterhead and signed by its President to all St. Mary's employees advising them of the judgment in this case, enclosing a copy of their policies prohibiting discrimination in employment because of age, sex, race, national origin, ancestry, and disability discrimination and from retaliation for engaging in protected activity opposing unlawful discrimination, and stating that they will not tolerate any such discrimination or retaliation, and will take appropriate disciplinary action against any employee or agent who engages in such discrimination or retaliation;

22

c.  Award Dr. Ikossi back pay for lost wages and benefits and prejudgment interest;

d.  Award compensatory damages in amounts to be determined at trial by the jury;

e.  Award punitive damages in amounts to be determined at trial by the jury;

f.  Award Dr. Ikossi as liquidated damages under the ADEA an amount equal to twice the amount of her unpaid wages for unequal pay;

g.  Award Dr. Ikossi full expenses and reasonable attorney's fees;

h.  Award Dr. Ikossi prejudgment interest; and

i.  Award such further relief as is deemed appropriate.

## Count II

## (Denial of Equal Pay for Comparable Work in Violation of the Maine Equal Pay Law, 26 M.R.S. §§ 628, 626-A)

88.     The allegations above are realleged.

89.     The corporate Defendants discriminated against Dr. Ikossi on the basis of sex by paying her less for comparable work that it paid male surgeons for comparable work, in violation of the Maine Equal Pay Law, 26 M.R.S. §§ 628, 626-A.

90.     As a result of the corporate Defendants' denial of equal pay on the basis of sex, Dr. Ikossi has suffered and will continue to suffer damages, including but not limited to unpaid wages.

91.     Dr. Ikossi requests relief against the corporate Defendants as follows:

a.   Enter declaratory relief that the corporate Defendants violated Dr. Ikossi's statutory civil right under Maine's Equal Pay law to be free of pay discrimination on the basis of sex;

b.   Enter injunctive relief ordering the corporate Defendants to:

i.     Provide effective civil rights training for all Human Resource employees and all supervisors in Maine on the requirements of the Maine Equal Pay law, and complete this

24

training within 60 days of the entry of Judgment for Injunctive Relief;

ii.    Provide this training for two years after the date judgment is entered to all new Human Resources and supervisory employees in Maine within 60 days of their starting the position;

iii.    Maintain attendance sheets identifying each person who attended each training session and forward a copy of the attendance sheets to Plaintiff's counsel within seven days of each training session;

iv.    Post at each of its worksites a copy of a remedial notice detailing the judgment in this case as well as the order providing injunctive relief;

v.    Send a letter printed on Defendant St. Mary's Regional Medical Center's letterhead and signed by its President to all St. Mary's employees advising them of the judgment in this case, enclosing a copy of their policies prohibiting pay discrimination on the basis of sex, and stating that they will not tolerate any such discrimination, and will take appropriate disciplinary action against any employee or agent who engages in such discrimination;

c.  Award Dr. Ikossi back pay for lost wages and benefits and prejudgment interest;

d.  Award Dr. Ikossi as liquidated damages an amount equal to twice the amount of her unpaid wages for unequal pay;

e.  Award Dr. Ikossi full expenses and reasonable attorney's fees;

f.  Award Dr. Ikossi prejudgment interest; and

g.  Award such further relief as is deemed appropriate.

Date: January 28, 2022                 Respectfully submitted,

/s/ David G. Webbert
David G. Webbert, Bar No. 7334
Johnson, Webbert & Garvan, LLP
160 Capitol Street, Suite 3
P.O. Box 79
Augusta, ME  04332-0079
Tel:  (207) 623-5110
dwebbert@work.law

/s/ Braden A. Beard
Braden A. Beard, Bar No. 6324
Johnson, Webbert & Garvan, LLP
160 Capitol Street, Suite 3
P.O. Box 79
Augusta, ME  04332-0079
Tel:  (207) 623-5110
bbeard@work.law

26

/s/ Ryan M. Schmitz
Ryan M. Schmitz, Bar No. 6345
Johnson, Webbert & Garvan, LLP
160 Capitol Street, Suite 3
P.O. Box 79
Augusta, ME 04332-0079
Tel: (207) 623-5110
rschmitz@work.law

*Attorneys for Plaintiff*