UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| MARIA IKOSSI, M.D., )<br>)<br>    Plaintiff )<br>)<br>  v. )<br>)<br>ST. MARY'S REGIONAL MEDICAL )<br>CENTER, et al., )<br>)<br>    Defendants ) | 2:22-cv-00023-LEW |

**RECOMMENDED DECISION ON
MOTION TO ENFORCE SETTLEMENT AGREEMENT**

In this action, Plaintiff alleges Defendants discriminated against her in her employment in violation of several federal statutes. Defendants contend that the parties agreed to settle this matter and, therefore, move to enforce the settlement. (Motion to Enforce, ECF No. 77.) Plaintiff argues that the parties did not reach a final agreement on all the material terms of a settlement.

After review of the parties' initial filings, the Court determined that an evidentiary hearing was warranted. Following an evidentiary hearing and after consideration of the parties' arguments, I recommend the Court deny Defendants' motion to enforce settlement agreement.

**FINDINGS OF FACT**

I recommend the Court find the following facts:

1. Beginning in November 2023, the parties participated in two sessions of a Judicial Settlement Conference with Magistrate Judge Karen F. Wolf.

2. Following the first session, the parties, through counsel, negotiated certain non-monetary terms of a possible settlement agreement. The non-monetary terms that were the focus of the post-conference communications were Plaintiff's request for a letter of reference and the rescission of disciplinary action Defendants had taken as to Plaintiff.

3. On January 4, 2024, Plaintiff's counsel advised Judge Wolf that the parties "made significant progress on non-monetary settlement terms and are ready to resume the judicial settlement conference process." (Exh. 4T.) Counsel attached to the email a draft of some of the non-monetary terms, which highlighted "the one point of disagreement over whether and what form of an apology should be included." (*Id*.)

4. On February 8, 2024, following the second session of the judicial settlement conference, a "Notice of Settlement" was entered on the docket. The parties were directed to complete the settlement and file a stipulation of dismissal within thirty days.

5. By email dated February 8, 2024, Defendants' counsel wrote to Plaintiff's counsel confirming that the parties had agreed to settle for a specific monetary amount "contingent upon execution of a mutually agreeable settlement release." (Exh. 1A.)

6. From the conclusion of the second session of the conference on February 8, 2024, through March 14, 2024, the parties, through counsel, exchanged multiple drafts of a written settlement agreement.

7. Defendants' counsel forwarded the first post-conference draft to Plaintiff's counsel on February 9, 2024. (Exh. 1B.) On February 23, 2024, Plaintiff's counsel advised Defendants' counsel that he was "waiting for instructions from Dr. Ikossi and will get back to you as soon as I can." (Exh. 1D.)

8. On March 1, 2024, Plaintiff's counsel forwarded to Defendants' counsel proposed changes to the draft agreement. (Exh. 1F.) Plaintiff's counsel stated in part: "I am authorized to send the attached counteroffer with the restriction that Dr. Ikossi is still considering whether other changes are also necessary." (*Id*.)

9. On March 4, 2024, Defendants' counsel responded to the counteroffer. (Exh. 1G.) Defendants' counsel responded in part: "[Y]ou have proposed a change in the material terms with respect to Section 3(B) by inserting a 3-year limitation on the no-rehire clause. A 3-year limitation was never negotiated nor agreed to. St. Mary's rejects your proposed additional term." (*Id*.) Defendants' counsel also wrote, "your proposed allocation of only 3% to wages appears unreasonable. We are willing to hear you out on it, but Dr. Ikossi has two counts in her Amended Complaint. One is specifically for unpaid wages under the Maine Equal Pay Law and the [sic] in the other she asks for 'back pay and benefits.'" (*Id*.) As of March 4, 2024, there was at least one other term that was unresolved—a confidentiality provision. (Hearing Transcript Vol. I at 75.)

10. On March 8, 2024, as to the money allocation, Defendants' counsel wrote to Plaintiffs' counsel: "St. Mary's must answer to auditors and the IRS. Putting $10K of a $200k settlement toward a wage claim when one of the two counts in the Complaint was for wages is unreasonable. We are willing, however, to allocate $62,400 to the W9 compensatory damages and $41,600 for the wage claim." (Exh. 1I.)

11. In a March 10, 2024, email to Defendants' counsel, Plaintiff's counsel addressed two unresolved issues: the amount of the settlement that would be allocated to Plaintiff's lost wage claim and the scope of the no-rehire provision. (Exh. 1J.)

12. On March 11, 2024, Plaintiff moved to extend the deadline to file the stipulation of dismissal. In the motion, Plaintiff asserted that "[p]rogress has been made but as of today the parties have not yet reached agreement on all the material terms of a settlement." (Motion to Extend Time, ECF No. 65.)

13. On March 12, 2024, Plaintiff's counsel proposed some language regarding the scope of the no-rehire provision and further wrote: "Please let me know if Defendants agree to this language and I will consult with Dr. Ikossi about how those clarifications may affect her position on the length of the no-reply (sic) provision." (Exh. 1L.)

14. On March 14, 2024, Defendants' counsel informed Plaintiff's counsel that Defendants agreed to the proposed language regarding the scope of the no-rehire provision. (Exh. 1M.) In a revised draft of the agreement, Defendants' counsel also proposed an alternative allocation for the wage claim. (*Id*.)

15. In response to the March 14, 2025, communication from Plaintiff's counsel, on March 22, 2025, Plaintiff's counsel forwarded to Defendants' counsel a proposed agreement with multiple changes, which agreement Plaintiff signed. (Exh. 1N.) The document Plaintiff signed included a no-rehire provision acceptable to Plaintiff and provided for Defendants to issue two checks, one to Plaintiff and one to Defendants. (Exh. 2I; Hearing Transcript Vol. II at 73-74.) The language did not provide for an allocation for lost wages. (Exh. 2I.)

16. Defendants' counsel responded to Plaintiff's counsel as follows: "This is absolutely not acceptable. We do not have an agreement. ….. I have not had the time to do a word-by-word comparison yet. However, the signed agreement you attached to your email has

been materially changed in numerous, substantive ways. The notion that the 'edits' in this document merely 'simplified some of the repetitive language' is at best an understatement and at most intentionally misleading." (Exh. 1N.) Defendants' counsel further wrote, "I will be submitting all of our correspondence regarding the release negotiations (including this email), the 3/4 Agreement, and the 3/21 Agreement to Judge Wolf to arrange another conference to try one final time to resolve the matter." (*Id.*)

17. On March 25, 2024, in an email to Judge Wolf, Defendants' counsel requested a third session of a Judicial Settlement Conference. (Exh. 1Q.) In the request, Defendants' counsel reported that following the second Judicial Settlement Conference, the parties had been working "diligently to finalize a settlement release agreement." (*Id.*) Counsel also advised that "[u]ltimately, the parties narrowed the dispute to two terms – the language of the No Re-hire provision and the settlement fund allocation split" and that subsequently, Defendants "adopted Plaintiff's suggested language on the No Re-Hire Provision." (*Id.*)

18. Plaintiff's trial counsel had Plaintiff's authority to propose on Plaintiff's behalf the terms that he proposed as the parties exchanged drafts of a settlement agreement.[1] The

---

[1] Defendants argue that the Court should draw a negative inference when Plaintiff invoked the attorney-client privilege in response to certain questions at the hearing. In my view, the Court need not address the issue of whether any inference should be drawn from the assertion of the privilege. Even without a negative inference from the assertion of the privilege, the evidence establishes that Plaintiff's counsel had Plaintiff's authority to propose the terms that are reflected in counsel's written communications with Defendants' counsel. While there was some initial suggestion that the scope of counsel's authority might be an issue, Plaintiff stipulated that she does not contend that her counsel exceeded her authority in counsel's communications with Defendants' counsel. (Stipulation, ECF No. 113.) The testimonial and documentary

terms proposed by Plaintiff's counsel with Plaintiff's authorization were terms to which Plaintiff agreed when proposed.

### DISCUSSION

"Settlement agreements enjoy great favor with the courts 'as a preferred alternative to costly, time-consuming litigation.'" *Mathewson Corp. v. Allied Marine Indust., Inc.*, 827 F.2d 850, 852 (1st Cir. 1987). Thus, a party to a settlement agreement may seek to enforce the agreement's terms when the other party refuses to comply." *Fidelity and Guar. Ins. Co. v. Star Equipment Corp.*, 541 F.3d 1, 5 (1st Cir. 2008). "[W]hen the underlying cause of action is federal in nature," a motion to enforce a settlement agreement "is determined in accordance with federal law." *Malave v. Carney Hosp.*, 170 F.3d 217, 220 (1st Cir. 1999); *see also Commonwealth School, Inc., v. Commonwealth Academy Holdings, LLC*, 994 F.3d 77, 85 (1st Cir. 2021) (On motion to enforce settlement in cases "arising under federal law and brought in federal court, federal common law supplies the substantive rules of decision.").

General contract law principles govern the interpretation of a settlement agreement. *Powell v. Omnicom*, 497 F.3d 124, 128 (2d Cir. 2007). "Federal common law on contract formation requires mutual assent as to all material terms in order for a valid contract to be formed." *Commonwealth School,* 994 F.3d at 85. "The party seeking to enforce a settlement agreement … carries the burden to establish its existence." *Michael v. Liberty*, 547 F. Supp. 2d 43, 50 (D. Me. 2009).

---

evidence also established that Plaintiff's counsel had Plaintiff's authority to propose on Plaintiff's behalf the terms included in counsel's communications.

While the parties have asserted multiple arguments and cited various authority in support of their respective positions, which arguments have included some evidentiary-based issues such as the effect, if any, of Plaintiff's assertion of the attorney-client privilege during the hearing, the essence of each party's position is relatively straight forward. Defendants contend that the parties agreed on the terms of a settlement, except for the specific amount of the monetary settlement that would be allocated to Plaintiff's lost wage claim. Defendants maintain that the parties agreed that the amount would be within IRS guidelines and, therefore, the Court can enforce the agreement by supplying a specific amount. Plaintiff argues that the parties did not agree on all the material terms of an agreement.

An initial question is whether the parties assented to all the material terms of a settlement agreement. A term "is material if it is an essential and inducing feature of the contract." *Foss v. City of New Bedford*, 621 F. Supp. 3d 203, 211 (D. Mass. 2022) (citations and internal quotation marks omitted). Although the parties disagree as to whether they achieved a binding settlement agreement, the evidence establishes that the parties did not agree on the amount of the monetary settlement that would be allocated to lost wages with the attendant tax consequences. Indeed, in their post-hearing brief, Defendants describe their position as follows: "[A]s of March 14, 2024, all terms of the settlement release agreement had been agreed to by all parties and reduced to writing in the March 14 Agreement except for the exact allocation of the [monetary settlement amount]. This is the agreement Defendants seek to enforce." (Defendants' Brief at p. 7, ECF No. 139.)

While in some cases the allocation might be deemed a non-material term, the record establishes that the term was material to the parties in this case. The parties debated and negotiated the issue at some length. The term was important to Plaintiff as the allocation directly impacts the amount of money Plaintiff would realize from any settlement. The provision was also important to Defendants as Defendants' counsel underscored on March 8, 2024, when he noted that Defendants "must answer to auditors and the IRS." Counsel's communications, the various drafts of the proposed settlement agreement, and the hearing testimony establish that the allocation was a material term of a settlement the parties were attempting to finalize. *See Kosack v. Entergy Enters., Inc.*, No. 14 CV 9605 (VB), 2016 WL 11700587, at *6 (S.D.N.Y. Sept. 27, 2016) (concluding that allocation is generally a material term because it "affects the actual amount of money plaintiff will receive from a settlement" and thus is in a sense "as material as the single most important term of the agreement, the settlement amount") (quotation marks omitted).[2]

Defendants argue that the lack of agreement on the amount of the allocation should not be an impediment to the enforcement of the parties' agreement. Defendants contend that where the parties have otherwise reached an agreement, the Court can insert a

---

[2] At least one court found a tax allocation issue to be immaterial for the parties in that case, but it did so because the parties did not negotiate on the issue at length, and because when the issue did arise, the parties' positions were such that there was a "small amount of money at stake," ($1000), and the court acknowledged that in "a scenario in which the tax allocation of the settlement could create a substantial tax consequence," the allocation term would be more likely to be material. *Demissie v. Starbucks Corp. Off. & Headquarters*, 118 F. Supp. 3d 29, 36 (D.D.C. 2015); *see also*, *Myers v. Greene Cnty. Bd. of Educ.*, No. 2:16-CV-00096, 2018 WL 6031325, at *12–13 (E.D. Tenn. Nov. 15, 2018) (finding allocation to be a material term and distinguishing *Demissie* because amount at stake was greater and because one party's need for other terms, such as an indemnity provision, depended on the allocation the parties were negotiating).

reasonable allocation term and enforce the agreement.  Defendants maintain that although the parties did not agree on an "exact allocation," the parties agreed to an allocation that complies with IRS regulations.[3] (Defendants' Brief at p. 5.)  Defendants argue the Court can and should make an allocation within IRS guidelines.

"[A] court can supply reasonable terms to a contract so long as there is mutual assent to an agreement that contains terms that enable the court to allocate liability." *Lush v. TERRI AND RUTH F/V, In rem.*, 324 F. Supp. 2d 90, 92-93 (D. Me. 2004) (citations and internal quotation marks omitted) (applying Maine law).[4]  The court in *Lush* further explained:

> In the Restatement's words, "the actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon.  In such cases, courts endeavor, if possible, to attach a sufficiently definite meaning to the bargain." *Restatement (Second) of Contracts § 33, cmt. a*.

324 F. Supp. 2d at 93.  However, a "missing or indefinite essential term may, in certain cases, … indicate a lack of contractual intent so as to render an agreement enforceable." *Fitzgerald v. Hutchins*, 2009 ME 115, ¶ 18, 983 A.2d 382.

---

[3] Citing a March 12, 2024, email communication from Plaintiff's counsel, Defendants assert that Plaintiff's counsel "indicated that Plaintiff would accept whatever Judge Wolf deemed reasonable regarding the tax allocation." (Defendants' Brief at p. 6.)  In the email, Plaintiff's counsel wrote, "Dr. Ikossi is prepared to go to Judge Wolf over this dispute but is willing to consider increasing the allocation to wages to $20,800 if Defendants will agree to that amount." (Exh. 1L.)  I do not construe the communication as a willingness to allow Judge Wolf to make the allocation determination.  Rather, I view the communication as expressing Plaintiff's willingness to explore whether Judge Wolf could assist the parties in reaching an agreement on the issue.  This interpretation of the communication is consistent with the plain language of the email and with counsel for Defendants' response that "if [Defendants' proposed allocation] is not acceptable to [Plaintiff] we are fine going back to Judge Wolf to discuss [the allocation]." (*Id.*)

[4] While federal common law governs the Court's assessment, "federal courts are normally 'free to borrow from state law,' absent any conflict between federal interests and the borrowed state law." *Commonwealth School, Inc.,* 994 F.3d at 85. (quoting *McCarthy v. Axure*, 22 F.3d 351, 356 (1st Cir. 1994)).

Presumably, parties seek to agree to an allocation that is within IRS guidelines in the settlement of every employment case in which a lost wage claim is asserted. The fact that the parties agreed to do so in this case is of little consequence. The record demonstrates that the parties fundamentally disagree about the amount that would be acceptable to the IRS. The parties' communications suggest there is a range that might be acceptable, which range is governed by the IRS's assessment of the facts of each case. The parties, however, have not agreed on a specific amount within the range and the record lacks evidence of a specific amount that the IRS would require the parties to allocate to the lost wage claim. *See Argyros v. Lightstone Grp., LLC*, No. 18-CV-5142 (AJN), 2019 WL 13255545, at *3–4 (S.D.N.Y. Jan. 7, 2019) ("as there is no evidence of a final determination of the breakdown of settlement funds [for tax purposes], the Court is unsure about the specific terms of the agreement Defendants ask it to enforce"). Furthermore, given the significance of the term to both parties as evidenced by the number and substance of the email communications between counsel on the issue, a concession by one party on the amount to be allocated to lost wages could conceivably have caused the party to seek further concessions on terms upon which the parties had agreed or to seek additional terms. The amount of the allocation matters to the parties, just as the total amount paid in this or any settlement matters to the parties. On the record in this case, the specific allocation amount is not a term that the Court can or should supply.

The fact that the parties might have agreed to all material terms but one does not mean the parties have an enforceable agreement. The lack of agreement on one material term is sufficient to preclude a finding of an enforceable agreement. *See, e.g.*, *Foss*, 621

F. Supp. 3d at 210-12 (no binding agreement where parties did not agree on terms of a confidentiality provision). Despite protracted negotiations, which included two Judicial Settlement Conferences, the exchange of multiple draft agreements, and many communications between counsel, the parties never confirmed to each other that they had a final agreement on all the material terms. Rather, their communications reflect that the parties did not have a complete agreement and that more discussion was required.[5] Regardless of how much time parties might devote to a negotiation or how close parties might come to an agreement, a court cannot supply a term without finding a "mutual assent to an agreement that contains terms that enable the court to allocate liability." *Lush*, 324 F. Supp. 2d at 92-93. Here, Defendants have failed to establish the requisite mutual assent.

## CONCLUSION

Based on the foregoing analysis, I recommend the Court deny Defendants' motion to enforce settlement agreement.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen

---

[5] For instance, as referenced above (footnote 3), in a March 12, 2024, email exchange, counsel for the parties discussed the possible need to return to Judge Wolf for further discussion of the allocation issue. (Exh. 1L.)

(14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

      Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

                                      /s/ John C. Nivison
                                      U.S. Magistrate Judge

Dated this 24th day of April, 2025.